[Civ. No. 4264. Third Appellate District.—October 21, 1931.]

MERTON CRUM et al., Respondents, v. MT. SHASTA POWER CORPORATION (a Corporation), Appellant.

Wm. B. Bosley, Thos. J. Straub, Jones & Dall, Athearn, Chandler & Farmer, Athearn, Chandler & Farmer & Devlin, Frank R. Devlin and Chenoweth & Leininger for Appellant.

Jesse W. Carter, Arthur C. Huston and Annette Abbott Adams for Respondents.

THOMPSON (R. L.), J.—This cause is presented to this court upon rehearing.

The appeal is from a judgment which was entered upon the rendering of a verdict for $20,000 as damages for the diversion of the water of Fall River from land which was deemed to be riparian thereto. The defendant, which is a hydroelectric power company, was also enjoined from using the water of that river until the judgment for damages is satisfied. The respondents, husband and wife, for convenience will be referred to as plaintiff.

Fall River empties into Pit River in the northeastern portion of Shasta County. The plaintiff owns 116 acres of farm land bordering on the south bank of Pit River on Pitville Pool, a distance of five miles above the mouth of Fall River. This pool is a mere enlargement of the bed of Pit River. Its waters are impounded during the summer months by a lava rock reef which forms a dam across Pit River below the mouth of Fall River. The plaintiff's land does not border on Fall River, but, upon the contrary, is located a distance of five miles from the nearest point to the last-mentioned stream. The plaintiff's land is, however, claimed to be riparian to Fall River since this stream contributes a substantial quantity of water which is impounded in this tributary pond and mingles with the body of the water of Pitville Pool upon which the land is located.

Pit River is a perennial stream, the source of which is Goose Lake in northern California. It flows in a southwesterly direction through Modoc and Shasta Counties, emptying into the Sacramento River north of Redding. It has a drainage of 4,000 square miles. In the lower reaches of Pit River it has a maximum flow of 10,000 second-feet of water in the winter-time. In the hot months of summer the minimum flow is but 30 second-feet. Fall River rises in the foothills of western Shasta County and flows southeasterly,

emptying into Pit River at Fall River mills. Fall River has a maximum of 1800 second-feet of water, with a minimum of approximately 1,000 second-feet.

Pitville Pool extends from the rock reef above mentioned upstream a distance of eight and a half miles to Young's Falls, just south of the town of Pitville. The bed of this pool is substantially level throughout its entire length. The pool has an average depth of thirteen and a half feet of water in the summer-time. Its width is 145 feet. It covers an area of 150 acres. It then contains 2,000 acre-feet of water. It is perpetually filled by the natural flow of water down Pit River, which stream is augmented by water from its upper tributaries, together with a quantity of water which is drained into the pool from the McArthur canal, which conveys water from Tule River. Fall River empties into this pool at a point 500 feet above the rock reef dam across Pit River. It contributes a large quantity of water to this pool, which mingles with and becomes an inseparable part of the *corpus* of water in Pitville Pool. Before and after the diversion of Fall River the surface of this pool was always maintained at an elevation which caused water to flow over the rock reef below the confluence of these two rivers. The average loss of water from this pool because of evaporation during the months of May to September, inclusive, of each year, is 7.3 vertical inches. There is no evidence of additional loss from seepage. The loss of water from this pool during the dry season, from evaporation and all other causes, is overcome by the minimum flow of 30 second-feet which descends Pit River over Young's Falls at the head of the pond. The maximum quantity of water which was pumped by the plaintiff from this pool for irrigating 20 acres of his land never exceeded a fraction of one second-foot of water. There is no evidence that the irrigation of his entire tract of 116 acres of land would require more than one second-foot of water during these summer months. The amount of water retained in this pool was never diminished, except temporarily, by the diversion of Fall River. The plaintiff does not complain of a diminution of water from this pool or a lack of water necessary for irrigation or domestic purposes. His claim of damages is based upon the doctrine of usufructuary title to the water of Fall River upon his riparian land which entitles him to the

natural flow of the stream regardless of his actual use of the water.

The defendant is a hydroelectric power company. It owns all the land riparian to Fall River from its confluence with Pit River to a point two and a half miles up Fall River. It also owns all the land riparian to Pit River from a point 600 feet above the juncture of these streams, down to the power plant which is located seven miles below the rock reef dam.

In 1920 the defendant began the construction of its dam, penstock and tunnel at Manning Falls on Fall River one mile above the mouth of this stream, for the purpose of diverting the water therefrom. The plaintiff had knowledge of these operations and of the purpose of the defendant to divert the water. He, however, testified he did not know the diversion of Fall River would affect the level of the water in Pitville Pool. He also testified he did not then know his land was riparian to Fall River. He made no protest against the diversion of this stream. From the point of diversion at Manning Falls, the defendant extended its tunnel southerly several miles across the intervening tract of land, connecting it with Pit River at a point seven miles south of the rock reef dam. At the juncture of this canal with Pit River, the defendant's power plant number one was constructed. September 30, 1922, the construction work for this enterprise was completed. On that date the defendant first temporarily diverted the water of Fall River through its penstock, tunnel and power plant for a trial run. This diversion resulted in lowering the water in Pitville Pool a depth of five feet. The water of Fall River was immediately turned back into its natural channel and the pool was again filled to its normal depth. The plaintiff does not complain of damages resulting from this temporary diversion of the stream.

There was a break in the western portion of this natural rock reef barrier in Pit River below the mouth of Fall River. This natural break contained a V-shaped crevice some eight feet in depth. Through this break in the reef a considerable quantity of water was enabled to escape from the Pitville Pool. Below the reef there was a series of rapids. Below the dam the elevation of the bed of Pit River dropped 18 feet in a distance of 300 feet of its course. After the water of Pitville

Pool was lowered by means of the diversion of Fall River, the defendant constructed a substantial concrete apron or dam across the break in the reef connecting the intact portion of the rock ledge with the western shore of Pit River. The V-shaped crevice was closed. The concrete dam was built from line level with the top of the rock reef to a depth of nine feet. It contained seven gates to act as spillways in time of flood water. The artificial improvement to the natural rock reef dam effectually impounded the water and restored the pool to its normal depth. The water of Fall River was then again diverted through the defendant's canal. The permanent diversion of Fall River, however, did not lower the depth of Pitville Pool after the concrete wing of the rock reef dam was constructed. The water from this pool continued at all times to flow over the dam. The plaintiff always had access to all the water he required, and to all the water he had ever enjoyed the use of from this pool.

This action was commenced June 4, 1923. The complaint contained two counts. The first cause of action sought injunctive relief to prohibit the diversion of Fall River. The second cause prayed for damages. All of the material allegations of the complaint were controverted. The cause was tried with a jury. A verdict of $20,000 damages was rendered in favor of the plaintiff. Findings were adopted favorable to the plaintiff. A judgment was accordingly entered in his favor for $20,000 damages and the defendant was perpetually enjoined from diverting any of the water of Fall River unless said judgment was satisfied within 60 days after the same became final. From this judgment the defendant has appealed.

The appellant asserts that certain findings and the judgment are not supported by the evidence. The chief contentions are that plaintiff's land is not riparian to Fall River for the reason that the current from that stream does not flow up Pitville Pool as far as the location of the land; that the diversion of Fall River has not diminished the water in Pitville Pool and the plaintiff has therefore shown no actual damage as a result thereof; that the court was without authority to issue an injunction which disregards the defendant's riparian rights to at least a portion of the water of Fall River, and that the amount of damages which was allowed

is grossly excessive, and is unsupported by competent evidence.

A vast amount of evidence was adduced at the trial, and much space is devoted in the briefs to the question as to whether the current from Fall River carries any portion of the water of that stream up Pitville Pool to the land of plaintiff. The evidence which was offered for the purpose of showing that the current from Fall River actually did convey the water of that stream up to the land of plaintiff, five miles above the rock reef dam, is very unsatisfactory. The plaintiff's theory is that the water of Fall River which is slightly colder than the water of Pit River therefore displaces the Pit River water at the bottom of the pool and thus creates a subsurface current which finds its way upstream along the bed of the pond. This theory furnishes no scientific principle which appeals to reason. It was also contended that the water of Fall River is purer and clearer than that of Pit River. No satisfactory experiments were offered by means of which the actual particles of the water of Fall River may be traced to the plaintiff's land. By neither analysis, color, temperature nor ingredients may it be reasonably said the identical *corpus* of the Fall River water was traced to the land of plaintiff five miles above the confluence of these two streams. It seems more reasonable to believe that when the water of Fall River was poured into this reservoir called Pitville Pool, it circulated and mingled indiscriminately with the waters contributed thereto from all other sources, so as to equalize the temperature and form the *corpus* of a miniature lake which was impounded by the barrier of the rock reef dam at its lower extremity.

This solution regarding the effect of impounding the water of Fall River and mingling it in Pitville Pool with the water of Pit River during the dry season is amply supported by the findings of the court, which read in part: "When the waters of Fall River flowed into said pool in the state of nature they commingled with the waters of Pit River and flowed up the channel of Pit River to Young's Falls, filling the pool in Pit River between said rock reef and said Young's Falls during the low water season of each year." In accordance with this view, the impounding and commingling of the bulk of the water of Fall River with that of Pit River in Pitville Pool during the dry season, regardless

of the existence of a current which may actually carry Fall River water up to the lands of the plaintiff, constitute a pond which thereby becomes tributary to Fall River during the dry season, and renders the plaintiff's land which is situated on Pitville Pool riparian to Fall River during that period of time. The findings of the court to the effect that an upstream current does exist in Pit River which carries Fall River water up to the lands of plaintiff are surplusage and harmless.

■ It may seem like fiction to say that land which is located on a pond formed by a dam in the bed of one stream, may still be riparian to another stream which is five miles distant from this land. While Fall River contributes a substantial quantity of water which mingles with and remains in Pitville Pool, this pond may be deemed to be an inlet or arm of Fall River, in spite of the fact that there is no current in the pool by means of which the water of the last-mentioned stream may be actually traced to the locality of the land. It is not essential that there shall be a current of the stream which actually washes the shores of plaintiff's land. It is sufficient if the waters of the respective streams mingle in the same reservoir to form the *corpus* of the same pool. The pond then becomes a basin which is tributary to both streams. This situation may then make plaintiff's land riparian to both rivers. The case of *Turner* v. *James Canal Co.*, 155 Cal. 82 [132 Am. St. Rep. 59, 17 Ann. Cas. 823, 22 L. R. A. (N. S.) 401, 99 Pac. 520, 522], is authority for this exact conclusion. It is there said:

"The right of a riparian owner to the use of water bordering upon his land does not, as plaintiffs contend, arise from the fact that the water is flowing and that any part thereof taken from the stream is immediately replaced by water from the current above it. It comes from the situation of the land with respect to the water, the opportunity afforded thereby to divert and use the water upon the land, the natural advantages and benefits resulting from the relative positions, and the presumption that the owner of the land acquired it with a view to the use and enjoyment of these opportunities, advantages, and benefits. (*Duckworth* v. *Watsonville etc. Co.*, 150 Cal. 526 [89 Pac. 338].) Out of regard to the equal rights of others whose lands may abut upon the same water, the law has declared, as will hereafter

be more fully shown, that the use of the water for irrigation, so far as it affects the right of others similarly situated, must be reasonable, and must be confined to a reasonable share thereof. But with this common limitation, the right to use water upon adjoining land applies as well to the water of a lake, pond, slough, or any natural body of water, by whatever name it may be called, as to a running stream. . . . We have never heard that riparian rights depended upon the character of the current in the water upon which these rights extend. They exist if the water be an artificial pond made by a dam in a water course, as well as when it is an unobstructed running stream.''

So long as the bulk of water from Fall River remains impounded in Pitville Pool, we may assume, upon the reasoning of the last-mentioned case, that plaintiff's land is riparian to Fall River.

It must be conceded, however, that the same situation does not prevail in times of flood water during which these two rivers rush down over the dam with mighty velocity at a depth of many feet. It is apparent that under such conditions very little of the water of Fall River remains impounded in the pool. During the season when the flood water and current of Pit River carry Fall River water down over the dam, the plaintiff's land is not riparian to Fall River. It follows that while the plaintiff's land may be riparian to Fall River during times of low water in the summer, it is not riparian to that stream during the season of flood water in the winter months.

The appellant suggests upon rehearing that this court has misconstrued the application of the case of *Turner* v. *James Canal Co.*, 155 Cal. 82 [132 Am. St. Rep. 59, 17 Ann. Cas. 823, 22 L. R. A. (N. S.) 401, 99 Pac. 520, 524], by holding that because the Pit and Fall Rivers both contribute to the supply of water in the Pitville Pool the land of plaintiff would become riparian to Fall River during the season when its water became an inseparable part of the *corpus* of that pond. It is pointed out that the Supreme Court held that the Fresno slough was an arm or inlet of the San Joaquin River only when the water from Kings River was not flowing into the slough; that the court did not hold that the land which was situated on the slough was riparian to both rivers at the same time. It is therefore argued that this court erred

in holding that the plaintiff's land was riparian to both Fall and Pit Rivers at the same time. We have re-examined that case with great care and have concluded there is nothing therein contained which is in conflict with what was said in our former opinion and which is herein adopted as the law of this case respecting that subject.

It is true the Turner case declares that, "When Kings River does not run into the slough, the latter becomes a part of the San Joaquin River, with which it is then connected." It appears from the Turner case there were seasons when no water flowed into the Fresno slough from the Kings River. It is said in that regard:

"The court does not find the length of time of each season that it happens that the water of Kings River does not reach Fresno slough and when, consequently, the slough receives water from the San Joaquin River exclusively, nor does it find what proportion of the year this latter condition prevails during the entire year. It clearly appears from the evidence, however, that this is the usual and ordinary condition, that seldom, during the dry season of any year, does Kings River water flow into Fresno slough for more than six weeks, and that, during that season, in some years it does not flow into the slough at all."

Nowhere is it stated in the Turner case that the land of the defendant, which was situated on Fresno slough, could not become riparian to both Kings and San Joaquin Rivers at the same time. It does not appear the waters of both of these rivers were ever mingled to form the *corpus* of the slough. That question does not appear to have been an issue in that case. There is no valid reason why land which borders on an inlet, lake or pond, which is substantially contributed to by the waters of two rivers, may not become riparian to both streams at the same time. If the land could become riparian to only one river at a time, under such circumstance, it would become difficult to determine which stream should bear the burden of the riparian rights.

In the present case the facts are somewhat different from those of the Turner case. In this case there is a natural rock reef dam below the confluence of the two rivers which serves to impound the bulk of the waters of both streams during the dry season. In the Fresno slough case (Turner case) no such condition exists. We are unable to escape from the principle de-

termined in the Turner case which makes the plaintiff's land in the present case riparian to Fall River while that stream contributes a substantial quantity of water to Pitville Pool which is impounded therein.

It is true that the defendant in the present case has no authority to divert water from Fall River at a point above its own riparian lands. In the case of *Miller & Lux* v. *Enterprise etc. Co.,* 169 Cal. 415, 441 [147 Pac. 567, 577], it is said:

"It is to be remembered that a riparian proprietor's title to the water begins only when it reaches his land and lasts only so long as it is flowing past his land. Until it reaches his land he has no title whatsoever and no right other than the protective right to see that the full flow past his land to which he is entitled is not illegally diminished."

But it will be observed the defendant owns all land on both sides of Fall River from a point above the diverting canal in that stream to a point on Pit River below the place where the water is returned to the last-mentioned stream where its power plant is located. It also owns the land riparian to the lower end of the Pitville Pool from a point which is 600 feet above the confluence of the two rivers. The defendant has therefore not violated the above rule. That rule has no application here.

The first cause of action which was alleged in the complaint herein asked for an injunction to prohibit the diversion of the water of Fall River. It appears that an injunction was granted as mere security for the payment of the judgment for damages. There may be some uncertainty regarding the application of the injunction in this case. Upon oral argument on the rehearing of this cause the respondent conceded that the injunction which was granted might be disregarded. Relying upon this concession, we shall therefore omit all that was said by this court in the original opinion on that subject except that in justice to the respondent the question of appellant's title to the water of Fall River by adverse possession should be determined. In his briefs the respondent contends that he is entitled to an injunction to prevent the continued diversion of the water of Fall River so that its use by the appellant may not ripen into title by adverse possession. The appellant, however, specifically disclaims title to this diverted water by adverse possession.

It asserts the right to divert and use this water as a riparian owner thereof for the beneficial purpose of manufacturing hydroelectric power only to the extent that other riparian owners are not in need of the water. It has been specifically determined by the Supreme Court in the case of *Fall River Irr. Dist.* v. *Mt. Shasta Power Corp.*, 202 Cal. 56 [56 A. L. R. 264, 259 Pac. 444], that the appellant's use of the water of Fall River was for proper riparian and beneficial purposes. (*Seneca Cons. G. Mines Co.* v. *Great Western Power Co.*, 209 Cal. 206, 215 [70 A. L. R. 210, 287 Pac. 93].)

■ Adverse possession must be accompanied with actual use of the water for the statutory period; it must be open, notorious and exclusive; it must be hostile to the rights of the party against whom it is claimed; it must be under a claim of property right; it must be continuous and uninterrupted. (2 Kinney on Irrigation and Water Rights, p. 1876, sec. 1048; 27 R. C. L., p. 1290, sec. 201.)

■ Under the circumstances of this case it may not be said the appellant's diversion of the water of Fall River will ripen into a claim of adverse possession. In the case of *Pabst* v. *Finmand*, 190 Cal. 124, 130 [211 Pac. 11, 13], it is said with regard to adverse possession of water: "In the absence of a showing that the upper owner is using the water under a claim of prescriptive right, the lower owner has the right to presume that such owner is only taking that to which he is entitled as a riparian owner by virtue of his riparian right. . . . Even if the upper riparian owner is using all the water of the stream, still if the lower riparian owner is not then using any and has no desire to do so, such use by the upper riparian owner would not be adverse and, if continued for five years, would not gain him a prescriptive right."

So, also, in the case of *Oliver* v. *Robnett*, 190 Cal. 51, 55 [210 Pac. 408, 410], it is said: "Title by prescription is only gained to the extent to which the rights of the lower riparian owner are interfered with. . . . The lower riparian owner . . . cannot complain of the use by an upper riparian owner except by showing that the upper owner uses an unreasonable quantity of the stream, having regard to the needs of the lower owner, and, consequently, . . . the lower owner cannot enjoin the use by an upper owner unless he alleges such unreasonable use to his injury."

There is no issue in the present case regarding an alleged unreasonable use of water on the part of the appellant, nor is there an issue involving the partition of water between riparian owners. Adverse title on the part of the appellant is not an issue in this case. It follows that an injunction is not warranted on the theory that it would prevent the appellant acquiring title to the water by adverse possession.

The plaintiff asserts his right to damages in the present case under the doctrine of usufructuary title on the theory that the fee to his land has been impaired by an unlawful diversion of the water of Fall River. There is a conflict of authorities regarding the application of this doctrine. Some California cases assert that it should be modified so as to permit all riparian owners of land to enjoy the use of a reasonable share of the water of a stream for beneficial purposes. (*Turner* v. *James Canal Co.*, 155 Cal. 82, 94 [132 Am. St. Rep. 59, 17 Ann. Cas. 823, 22 L. R. A. (N. S.) 401, 99 Pac. 520, 525]; *Half Moon Bay Land Co.* v. *Cowell*, 173 Cal. 543 [160 Pac. 675]; *Pabst* v. *Finmand*, 190 Cal. 124 [211 Pac. 11].) Most modern authorities from other jurisdictions agree that this doctrine is inequitable and obsolete. It is founded upon a fiction of law.

In a rapidly developing state, with a growing population, mighty industries and expansive farms which demand an increased allotment of water, it seems imperative this ancient common-law rule should be speedily modified to serve the needs of the public. It is incompatible with the interests of modern agricultural and industrial conditions in this state that a riparian land owner be permitted to watch a stream flow uselessly past his premises to the sea while upper riparian owners are deprived of their reasonable share of the water for beneficial purposes. Mr. Justice Shaw wisely said in the case of *Turner* v. *James Canal Co., supra:* "If this supposed rule were strictly enforced against riparian owners, as well as appropriators, the waters of the streams in the state could not be used at all, but would flow to the sea. . . . The rule is evidently not suited to the conditions of a dry climate such as we have in this state. . . . Each riparian owner has a right to a reasonable use of the water on his riparian land for the irrigation thereof, and the so-called common-law right of each to have the stream flow by

his land without diminution, is subject to the common right of all to a reasonable share of the water.''

The learned author of Kinney on Irrigation and Water Rights, in volume 3, page 2943, says: ''We deem the true rule to be that the lower riparian owner seeking the injunction must show some real, material, and substantial damage to justify a court of equity in enjoining an upper claimant from his actual beneficial use of the water. . . . Owing to the great need and scarcity of water in this western country, and the necessity that all of the available water supply be put to some beneficial use or purpose, the courts are rapidly coming to this view.''

The justice of this suggested modification applies with increased force to the facts of the present case. The water of Fall River never flowed past the premises of the plaintiff. His property is situated five miles above the mouth of this stream. The depth of the water in Pitville Pool remains exactly the same as it was before the diversion complained of. There is no satisfactory evidence that either the quality or the quantity of water in the pool has been changed by the diversion of Fall River. There was adequate water in this pool for all purposes for which the plaintiff desired it. The small quantity of water which he pumped from this pool had no appreciable effect upon its volume. There is no evidence that a continuation of the present condition would ever result in depriving the plaintiff of the use of any water which he now possesses.

It is true the law will presume the existence of damages as the result of an unlawful diversion of a stream, under certain circumstances, without proof of that fact. But this presumption is for the purpose of affording equitable relief. Since the injunction has been abandoned in the present case, the doctrine of presumptive damages does not apply. The burden is on the plaintiff to sustain his allegation of damages by competent proof thereof. It becomes necessary for him to show that his property was actually damaged by the diversion of the water of Fall River.

The plaintiff asserts his right to damages in this case upon the doctrine of usufructuary title to the water of Fall River as a part and parcel of his land which is technically riparian to that stream by virtue of the fact that it contributes a substantial quantity of water to the

pool in Pit River upon which his land actually borders. The principle of usufructuary title to water is declared in 27 Ruling Case Law, 1091, section 30, as follows: "It is the well settled general rule that a riparian proprietor has a right to have the water of a stream flow down to his land as it is wont to run, in its natural mode and course, undiminished in quantity and unimpaired in quality, unless this right has been limited or destroyed by an appropriation and adverse use thereof by some other person, continued sufficiently long to create a right in the adverse holder. This right of the riparian proprietor to the flow of the water is inseparably annexed to the soil, and passes with it not as a mere easement or appurtenant, but as a part and parcel of it. . . . It is a private property right in the proprietor within the protection of the constitutional provision that private property shall be forever held inviolate. . . . The property consists, not in the water itself, but in the added value which the stream gives to the land through which it flows."

The controversy regarding the application of the foregoing doctrine of usufructuary title to water has been set at rest in this state by the case of *Herminghaus* v. *Southern California Edison Co.*, 200 Cal. 81, 112 [252 Pac. 607, 615], wherein it is said: "The riparian owners have a right to have the stream flow past their land in its usual course, and this right, so far as it is of regular occurrence and beneficial to their land, is, as we have frequently said, a right of property, a parcel of the land itself."

We have held that plaintiff's land is technically riparian to Fall River because it borders on Pitville Pool, to which pond that stream contributes a substantial quantity of water during the dry season. It follows that a diversion of that river destroys the natural condition which makes the land bordering on Pitville Pool riparian to that stream. If the contribution of Fall River water to Pitville Pool is beneficial to the land of plaintiff then he is afforded a remedy for its withdrawal, by means of a suit for damages or for injunctive relief. He has seen fit to rely upon a suit for damages.

The appellant contends that since the flow of Pit River is always adequate to keep the pool filled to a depth which results in a constant flow over the rock reef barrier, the contribution of Fall River water is neither necessary nor

beneficial to plaintiff's land. This is not necessarily true. Conditions may change. The removal of Fall River water may diminish the quantity or impair the quality of the water which is impounded in that pool. Assuming the evidence does adequately show that the water which is normally contributed to Pitville Pool is beneficial to the land of the plaintiff which is located thereon, the plaintiff would be entitled under the pleadings in this case to whatever actual damages he has suffered from the diversion of the stream.

The measure of damages for the unlawful diversion of water from land which is riparian to a stream is the difference between the market value of the land before and after the diversion. (26 Cal. Jur. 550, sec. 794; *Seneca Cons. Gold Mines Co.* v. *Great Western Power Co.*, 209 Cal. 206, 222 [70 A. L. R. 210, 287 Pac. 93].) This is the method by which the plaintiff sought to establish his damage in the present case.

In view of the circumstances of this case, the damages which were found by the jury and fixed by the judgment are excessive. The water of Fall River did not flow past the plaintiff's property. His land was situated five miles from the nearest point to this stream. The quantity of water in Pitville Pool remained exactly the same after the diversion as it was before that occasion. The plaintiff was deprived of no water by virtue of the diversion. The pool was kept filled by the natural flow of Pit River. The plaintiff pumped from Pitville Pool all the water which he desired or could use. He did not know, until shortly prior to the commencement of this action, that his land was deemed to be riparian to Fall River. It seems highly speculative to say that his land depreciated in value on account of the diversion of a stream which is five miles distant from the property, unless the removal of Fall River water from Pitville Pool detrimentally affected his property rights. Some tangible evidence of actual damage should be shown.

The evidence of damage in the present case is insufficient to support the judgment. The amount of damages is excessive. In spite of the fact that the plaintiff was deprived of no water which he desired to use; that he pumped only one second-foot of water from the pool to irrigate less than 20 acres of land which was used chiefly for grazing purposes; that the flow of water down Pit River kept the pond filled

to the normal depth so that it always ran over the top of the dam; that the plaintiff did not know his land was deemed to be riparian to Fall River until shortly before this action was commenced; that he suffered no monetary loss by virtue of the diversion, the jury awarded damages in the sum of $20,000. This is over $172 an acre. The evidence shows that his entire tract of land was purchased in 1920 for $14,000. This was the time when land sold for its highest valuation. There is no evidence of sales of land in that vicinity for more than $100 an acre. There were sales testified to for from $30 to $60 an acre.

 Moreover, the evidence in support of damages is incompetent. It was based upon the erroneous assumption that the depth of Pitville Pool was permanently decreased four or five feet after the diversion of the water of Fall River, and that the plaintiff's land was therefore deprived of the benefit of the use of water. This is not true.

The plaintiff's evidence of damage sustained by virtue of the diversion of the water of Fall River rests upon the testimony of six witnesses, to wit, Loosley, Lee, Reynolds, Joerger, Opdyke and Roderick McArthur. These witnesses testified that before the diversion in 1922 the land was worth from $250 to $400 an acre. Over the objections of the defendant each of these witnesses was erroneously permitted to answer a hypothetical question in substantially this language: "Assuming that on and after September 30, 1922, the Mt. Shasta Power Corporation diverted all of the waters of Fall river above its confluence with Pit river, and by reason of the diversion of the waters of Fall river the water level in Pit river at the Crum place dropped from four to five feet in elevation, and that the source of supply of Pit river from Fall river was thereby eliminated, what in your opinion would be the market value of the Crum lands after that condition existed?" To this misleading question these witnesses replied that the value of the land would be reduced to from $15 to $40 an acre. Some witnesses testified that under such circumstances it would have no value. These estimates of damage were based upon the erroneous assumption that the water in Pitville Pool was permanently reduced in depth four or five feet, and that the Crum land was thereby permanently deprived of the benefit of all water for irrigation purposes. Mr. Reynolds said: "The water being

withdrawn from the land, it can only be used for one purpose, practically. That would be dry farming, grain farming you might say. In my opinion, when you withdraw the water from the land in this country, you are taking about all the value that it has. . . . I wouldn't consider that it had any value [without the water], for that reason, very little value. Probably it would sell for something, but not to me."

The undisputed fact, according to the record in this case, is that the water in Pitville Pool was immediately restored to its original depth and thereafter remained at its normal level when the dam was improved by the construction of the concrete apron. The depth of the water in Pitville Pool was diminished only temporarily during a "trial run". The plaintiff does not complain of damage which occurred during the brief period in which the depth of the water in the pool was reduced. ■ The witnesses did not base their estimate of damages upon the mere diversion of the water of Fall River, nor upon the diminution of the value of the land because of an artificial change in the natural rock reef dam, by the construction of a concrete apron. It may not be reasonably said this artificial change damaged the plaintiff's land. Upon the contrary, it benefited his land. For it served to retain more water in Pitville Pool than would have otherwise been impounded therein. It seems conclusive that these witnesses based their estimate of the amount of damages solely upon the theory that the level of the water in Pitville Pool was lowered four or five feet by the diversion of the stream. The explanation of the estimate of damages which was fixed by the witness Reynolds was that "the water being withdrawn from the land, . . . [the result] would be dry farming. . . . Withdraw the water from the land in this country, you are taking about all the value that it has." From the hypothetical question above quoted it is apparent the witnesses based their estimates of damages solely upon a permanent absence of water in the pool to the extent of four or five feet in depth. This assumption is in conflict with the undisputed facts of the case. A verdict for damages based upon such an erroneous hypothesis is clearly unsupported by the evidence.

■ It is suggested the defendant had no right to change the natural condition of the rock reef dam by closing the V-shaped orifice therein with a concrete apron so as to

impound more water in the pool than it would have otherwise retained; that the plaintiff was entitled to have the dam maintained in its original natural condition; that since the depth of the pool was temporarily diminished four or five feet by the diversion of Fall River before the dam was improved, the measure of plaintiff's damages should be estimated on the basis of the condition of the dam before the concrete apron was constructed; that the hypothetical question based upon a permanent reduction of the water in Pitville Pool was therefore proper. We are convinced this is not true. The construction of the artificial concrete, apron on the natural rock reef dam was not detrimental to the plaintiff. Unless it caused the water of Pitville Pool to become stagnant by impounding more water therein than it formerly held, it would become a benefit rather than an injury, for it furnished the plaintiff with an increased quantity of water. The water thereafter continued to flow over the dam at all times. It is true that a riparian owner is entitled to maintain such natural conditions of a stream which flows past his land as are beneficial thereto. But it is unreasonable to hold that one may complain of alterations in natural conditions, which changes are not detrimental.

The respondent may not complain of the mere artificial means of supplying the water so long as he secures the same quantity and quality which were furnished by the natural flow of the stream. In the case of *Wiggins* v. *Muscupiabe L. & W. Co.*, 113 Cal. 182, 196 [54 Am. St. Rep. 337, 32 L. R. A. 667, 45 Pac. 160, 164], it is said:

"The plaintiff could under no circumstances be entitled to the use of more water than would reach his land by the natural flow of the stream, and, if he receives this flow upon his land, it is immaterial to him whether it is received by means of the natural course of the stream or by artificial means."

It will be recalled the defendant owns all the land on both sides of the river where this dam is located. Since the improvement in the natural dam served to impound a greater quantity of water in the pool, we assume the change was a benefit and not an injury to the land of plaintiff.

Referring to the remedy of a riparian owner of land for injuries resulting from the construction of a dam by an upper owner, it is said in 40 Cyc., at page 682:

"To justify a recovery on any of these grounds, some actual and appreciable injury to the plaintiff must be shown."

On page 666 of the same volume it is said:

"A riparian owner may lawfully erect a dam across the stream on his own land, provided it does not materially injure other owners on the stream."

Mr. Justice McFarland says in the case of *Fisher* v. *Feige,* 137 Cal. 39 [92 Am. St. Rep. 77, 59 L. R. A. 333, 69 Pac. 618, 619]:

"A man may build a dam across a stream on his own land, provided that thereby he does not appreciably diminish the amount of water which should naturally flow on to the land of his neighbor below."

■■■ A mere artificial change in the natural condition of a stream is not necessarily actionable by a riparian owner, unless it results in injury to his land. In *Coleman* v. *Le Franc,* 137 Cal. 214 [69 Pac. 1011], the court quotes with approval from *Charnock* v. *Higuerra,* 111 Cal. 473 [52 Am. St. Rep. 195, 32 L. R. A. 190, 44 Pac. 171], as follows:

" 'Every diversion of water from a stream is artificial—a disturbance of the natural order of things. A dam or a ditch is as much an artificial mechanism as a pump,— . . . the one alters the natural condition in the same sense that the other does'; and it was held that the method of diversion was immaterial, *so long as the use did not infringe the like and equal rights of others.*"

Upon the foregoing authorities we are persuaded the defendant's construction of the improvement to the dam did not create a liability against it, in the absence of evidence that this change in the natural condition of the rock reef was detrimental to the land of the plaintiff.

■■■ It is asserted that damages should be estimated in the present case regardless of the benefit which may have resulted from the impounding of water in Pitville Pool by means of the improvement to the dam which was constructed by the appellant; that the doctrine of eminent domain is here involved, and that compensation for the water taken must be allowed under article I, section 14, of the Constitution of California "irrespective of any benefits from any improvement" which may have been made. That section of the Constitution reads in part:

"Private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for, the owner, and *no right of way shall be appropriated* to the use of any corporation, except a municipal corporation or a county or the state until full compensation therefor be first made in money or ascertained and paid into court for the owner, irrespective of any benefits from any improvement proposed by such corporation, . . . "

We are of the opinion the rule of excluding the value of improvements from an estimation of damages in certain eminent domain proceedings has no application in this case. The above provision of the Constitution limits the exclusion of the value of improvements to the condemnation of rights of way. It has no application to the taking of other private property. (*San Francisco, A. & S. R. Co.* v. *Caldwell,* 31 Cal. 368; *California Pac. R. Co.* v. *Armstrong,* 46 Cal. 85.)

The rule in California is well established in eminent domain cases, other than those which involve rights of way, to the effect that both general and special benefits which accrue to either the portion of property which is taken or that which remains, may be considered and set off against the damages which are assessed. (2 Lewis on Eminent Domain, 3d ed., 1192, sec. 692.) The rule is different in some other jurisdictions. In accordance with the preceding statement of the rule in California, section 1248 of the Code of Civil Procedure specifically requires the court to ascertain and allow the value of improvements as an offset to the damages resulting from the condemnation of private property. That section of the code under the title of Eminent Domain, reads in part:

"The court . . . must ascertain and assess: . . .

"3. Separately, how much the portion not sought to be condemned, and each estate or interest therein, will be benefited, if at all, by the construction of the improvement proposed by the plaintiff; and if the benefit shall be equal to the damages assessed under subdivision two, the owner of the parcel shall be allowed no compensation except the value of the portion taken; but if the benefit shall be less than the damages so assessed, the former shall be deducted from the latter, and the remainder shall be the only damages allowed in addition to the value;

"4. If the property sought to be condemned be water, or the use of water, belonging to riparian owners, or appurtenant to any lands, how much the lands of the riparian owner, or the lands to which the property sought to be condemned is appurtenant, will be benefited, if at all, by a diversion of water from its natural course, by the construction and maintenance, by the person or corporation in whose favor the right of eminent domain is exercised, of works for the distribution and convenient delivery of water upon said lands; and such benefit, if any, shall be deducted from any damages awarded the owner of such property."

It seems clear that any benefit which may have accrued to the land of plaintiff as a result of the improvement to the dam, so as to impound a larger quantity of water for his use, should be taken into consideration in estimating the amount of damages, if any, which were sustained on account of the diversion of Fall River. Moreover, it is competent to consider the result of the improvement to the dam in determining whether the plaintiff's riparian title to the water was impaired. The appellant contends that because of its improvement to the dam, the plaintiff lost no water to which he was entitled. This is a proper question of fact to be determined.

The respondent further asserts that the diversion of the water of Fall River resulted in the pool becoming stagnant and caused a dense growth of weeds and other vegetable matter in the water of the pool, rendering it unsanitary and unwholesome. ▇▇▇ Under the California authorities a riparian owner of land is entitled to not only an undiminished flow of water but also to a substantially unpolluted stream. He is entitled to maintain substantially the same quantity and quality of water with which nature provided his land.

▇▇▇ While it is true there is some evidence of the presence of weeds, tule and scum in Pitville Pool, we are of the opinion the testimony will not warrant a finding to the effect that this condition was caused by the diversion of the water of Fall River. All that the court finds upon this subject is: "That the waters naturally flowing in Pit river by plaintiffs' said lands during the low water season of each year, without the waters of Fall river are negligible

and constitute a stagnant pool of black water unfit for watering of stock or other uses on plaintiffs' said lands, except for irrigation." This is not a definite finding that the diversion of the water of Fall River caused the water of Pitville Pool to become stagnant. Our attention is called to no evidence which will support such a finding. But assuming that the finding may be so construed, we are of the opinion there is no substantial evidence to support a judgment of damages based upon pollution of the water of Pitville Pool caused by the diversion of Fall River.

The appellant complains of various other errors in the admission of testimony, and in the giving and refusing of certain instructions. In view of the preceding application of the principles of law, it is unnecessary to analyze those instructions or pass upon the numerous other assignments of error.

The judgment is reversed.

Preston, P. J., concurred.

Plummer, J., concurred in the judgment of reversal.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 20, 1931, and a petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 17, 1931.

Curtis, J., dissented.

Preston, J., did not participate.