[Civ. No. S. C. 28. Second Appellate District, Division One.—April 30, 1937.]

ANTONE RILOVICH, Respondent, v. MARY PERKINS RAYMOND et al., Appellants.

W. G. Irving, Clarke & Bowker and James C. Hollingsworth for Appellants.

Daly B. Robnett, Louis Luckel and J. L. Murphey for Respondent.

SHINN, J., *pro tem.*—In 1910, Dr. S. L. Stuart and his wife, owners of a tract of land in Ojai Valley, Ventura County, sold and conveyed twenty acres thereof to Antone Rilovich, plaintiff herein. On the same day, and as a part of the transaction, Stuart executed a written agreement reading as follows: "This agreement made and entered into this 27th day of October, A. D. 1910, by and between S. L. Stuart, the party of the first part, and Antone Rilovich, the party of the second part, Witnesseth: Whereas, the party of the first part is the proprietor of a system of water works and pipe lines for the purpose of furnishing water for the irrigation of certain lands in Section 5, T. 4 N., R. 22 W., S.B.M. and, Whereas, the party of the first part has conveyed to the party of the second part 20.00 acres of land in lot 3, Section 5, T. 4 N. R. 22 W. S.B.M. by deed of even date herewith, and intended to be forthwith recorded in the office of the County Recorder of Ventura County, State of California, Now, Therefore, this agreement witnesseth; That the party of the first part agrees to furnish the party of the second part, for the price or sum of twenty cents (20c) for each one thousand gallons of water used by said party of the second part upon the land particularly described in said deed of even date herewith. It being understood that said water is to be supplied from the system of water pipes as now constructed and maintained by the party of the first part, and that all expense in making connections to and with said system of pipes and conducting said water to said land, including all tanks, measuring devices or meters for measuring said water, shall be at the sole cost and expense of the party of the second part. And it is also understood that the party of the first part reserves the right and privilege of remodeling, changing and reconstructing said system of water pipes at his option. In witness whereof the said party of the first part has hereunto set his hand and seal the day and year first above written. (Signed) S. L. Stuart (seal), (Signed) Martha A. Stuart."

The land which Stuart retained, and on which certain water sources and distributing facilities were located, was sold by him in January, 1912, and after passing through various ownerships was conveyed on the 6th day of February, 1919, to defendant George P. Raymond, who conveyed it on the 1st day of May, 1922, to defendant Mary Perkins Raymond, who conveyed it to defendant Charles G. Raymond on February 11, 1926.

Plaintiff went into possession of the land he had purchased in 1910 and from time to time improved the land by clearing a portion thereof and planting orange nursery stock and about six acres of orange orchard. He brought this action December 8, 1925, alleging breach by the defendants, other than Charles G. Raymond, of the contract to furnish him with water, and he sought damages therefor in the sum of $30,000. By later amendments to the complaint, Charles G. Raymond was named as a defendant and the prayer of the complaint for damages was increased to the sum of $252,234.51. The case was tried in 1934 before the court without a jury and judgment was rendered against the several defendants as follows: George P. Raymond, $6,000; Mary Perkins Raymond, $30,176; Charles G. Raymond, $17,000, and Mary Perkins Raymond and Charles G. Raymond, jointly and severally, $12,000, or a total of $65,176. The basis of these several awards was the alleged loss of nursery stock and profits that might have been realized therefrom, the loss of crops of oranges which might have been, but were not grown in the orchard, and damage to the trees themselves. George P. Raymond, Mary Perkins Raymond, and Charles G. Raymond appeal from the judgment.

The case was before the Supreme Court upon a former appeal (211 Cal. 422 [295 Pac. 819]). Upon that appeal the judgment which had been given in favor of the then defendants, after an order sustaining demurrers to the complaint without leave to amend, was reversed. The Supreme Court construed the water contract as one which created in plaintiff a property right or easement to take water for irrigation from the water system on the land retained by Stuart. This right was held to be for the benefit of the land conveyed to Rilovich, and the agreement was held to be binding upon all those taking the Stuart land with notice thereof. It was also held that the agreement was not uncertain in failing to specify the quantity of water which was to be supplied for the irrigation

of plaintiff's land. The court said in part: "It is obvious that the consideration paid by the plaintiff Rilovich to the Stuarts supports both the conveyance of the twenty-acre tract sold by Dr. Stuart to Rilovich and the agreement on the part of the grantor by which the plaintiff was given the right to enter the adjoining land of the Stuarts, make a connection with the water system thereon, and take therefrom sufficient water to irrigate the land conveyed."

The main controversy between the parties relates to the quantity of water plaintiff was entitled to and this depends upon the identity of the water supply in which plaintiff acquired an interest. The sources of the water which was being used on the Stuart land in 1910 were two wells and certain surface water, which surface water flowed during the rainy season of each year from the west fork of San Antonio Creek, sometimes called Gridley Canyon. The surface water ceased to flow as early as June 1st of each year and none came thereafter except from rainfall. The upper well, owned in equal interests by Stuart and one Gibson, was in the canyon above the orchards of the several parties. Water from the upper well and the creek flowed south through a four-inch pipe line belonging to and maintained by Dr. Stuart to a small settling reservoir on the Stuart land. The lower well was located close by the reservoir. The land conveyed to Rilovich lay below the upper sources of supply but above the lower well and reservoir. It is the contention of the defendants, and has been at all times, that plaintiff acquired no right to receive water from the lower well, although they do not dispute his right to water from the upper sources when water is available. Plaintiff contends that his right to water extends also to the lower well. The trial court found in plaintiff's favor upon this question, and damages were awarded because of the breach of the supposed right of plaintiff to receive what water he needed from the lower well, which was a good well, for the irrigation of his land, whenever the supply available from the upper source was inadequate for his purposes, as was frequently the case.

The provisions of the contract which govern in the matter read as follows: "It being understood that said water is to be supplied from the system of water pipes as now constructed and maintained by the party of the first part, and that all expense in making connections to and with said system of

pipes and conducting said water to said land, including all tanks, measuring devices or meters for measuring said water, shall be at the sole cost and expense of the party of the second part. And it is also understood that the party of the first part reserves the right and privilege of remodeling, changing and reconstructing said system of water pipes at his option.''

If the lower well was a part of the ''system of water pipes as now (then) constructed and maintained'' by Stuart, the trial court, of course, correctly held that plaintiff has been entitled at all times to augment the supply from the upper source with the necessary amount of water from the lower well. If the latter well was not at the time of the contract a part of the system of pipes as then ''constructed and maintained'' by Stuart, the trial court committed error not only in declaring plaintiff to be possessed of a right to receive water from the lower supply but also in the disposition of the issues of damages, as hereinafter set forth.

After a study of the record and the briefs, which present exhaustive argument upon all of the points in issue, we find ourselves unable to agree with the conclusions reached by the trial court.

Both from the language of the contract and the acts of the parties over a long period of years, consistent with that construction, it appears that the rights granted to plaintiff were in the water from the upper source alone. Dr. Stuart owned lands both above and below the lower well. The water was raised in the upper well by a pump and, with the surface water collected, flowed through the four-inch pipe and was distributed over the Stuart lands by gravity. Likewise, water was pumped from the lower well and was distributed by gravity over the Stuart lands which lay below that well. The lower well and distribution system were, in 1910, and thereafter remained, except as noted hereafter, entirely independent of the system of pipes from the upper source. After purchasing his land, Rilovich laid a two-inch pipe therefrom easterly across the intervening land and connected the same with the four-inch line which came from the upper well. A valve was installed by means of which water could be diverted from the four-inch line into the two-inch line. This connection was made in 1911. It was located some 900 feet north of the reservoir. It was later relocated at a point some 600 feet north of the reservoir. Through this pipe line Rilovich

received his water for irrigation. His needs in the beginning were small, but with the improvement of his land they gradually increased. This water source was available and was used by him, without question, until and during the summer of 1922, although the upper well was abandoned in the summer of 1921 and has not since been used. Thereafter water came through the four-inch line only when the creek was flowing. The surface water which flowed from the creek was available until about the first of June of each year. In 1923 defendant Mary Perkins Raymond abandoned the creek as a source of supply and the connection was not reestablished until 1926, when Charles G. Raymond laid a new line around the old line in such a manner as to join with the same at a point below the two-inch line of plaintiff. Plaintiff has received no water from defendants since 1924.

There was at all times sufficient water from the lower well to irrigate plaintiff's land, but we are of the opinion that plaintiff failed to establish any right to water from that well. We reach this conclusion after a consideration of the terms of the agreement and the circumstances and situation of the parties at the time it was entered into.

All of the Stuart lands, as we have pointed out, were irrigated by gravity distribution of the water. The only pumps were those which brought the water to the surface. The only supply which could be carried to the Rilovich land, as the water system was then ''constructed and maintained'', was that which came from the upper source. To supply it from the lower well would have required the installation of pumping equipment capable of lifting the water from the well and elevating it some 30 feet, and a connection with the four-inch line which ran from the reservoir to the upper well. It would have required also a pipe line sufficiently strong to withstand the pressure of the water which was lifted through it. The installation of this equipment would have materially changed the system as it existed in 1910, as well as the method by which water could be delivered to lands above the lower well. There cannot be read into the contract any obligation on the part of Stuart to remodel or add to the original system. He reserved the right to make changes in the system but he was not obliged to do so, nor can the contract be construed as requiring Dr. Stuart at any time to change the method of delivery of water from a gravity distribution from

the upper source to a distribution which would require pumping from the lower source. The provision of the agreement that water was to be furnished from the system of pipes "as now constructed and maintained" cannot be ignored. The limitation upon the rights granted to Rilovich no doubt was intended, and should be so construed, to leave the grantor free to develop and use other water supplies and other means of distribution free from any claim thereon by the grantee. Rilovich was not given the right to receive water from the wells of Stuart, but only from a supply furnished by a single system of pipes then constructed and maintained. As we have pointed out, the lower well was no part of this system. By the judgment Rilovich has been given the right to receive surface water from the canyon and from both wells on the Stuart property, and defendants Raymond have been placed under the obligation of pumping water to the Rilovich land, which had never been done prior to 1921, eleven years after the water agreement was executed. These correlative rights and burdens of the parties are far beyond those established by the agreement. It is appropriate to say here that the contract did not require Dr. Stuart to distribute water over the Rilovich lands, nor was there in its provisions a direct or implied promise to raise water to the Rilovich land in the event Dr. Stuart or his successors should, through additions to the system, pump water from their lower well to their higher lands. (*Moulton Irrigated Lands Co.* v. *Jones,* 43 Cal. App. 732 [185 Pac. 684].)

We find nothing in the conduct of the parties or the surrounding circumstances which are relied upon by respondent as having an important bearing upon the interpretation of the contract, which would justify the construction for which respondent contends. It appears to be quite probable that the amount of water which could be delivered from the upper source was inadequate to irrigate the Rilovich 20 acres during the irrigating season and other lands for which Dr. Stuart had agreed to furnish water. If this be true, as respondent contends, it would appear that Dr. Stuart bound himself to furnish more water than he could deliver from that source, and that Rilovich contracted for more water than was available for his use from the upper source. It is argued that this would have been an unreasonable contract for the parties to make, and that, therefore, it must be considered to have been

their intention that the water was to be furnished from the lower well whenever it was necessary to supplement the supply from the upper source. It does not appear that there was any understanding between Rilovich and Dr. Stuart as to how the former would improve his lands, whether he intended to set out the 20 acres to orchard or merely to conduct a nursery business. Granted, however, that Rilovich acquired the right to irrigate as much of the 20 acres as he should see fit to cultivate and improve, the fact that the parties made an improvident contract furnishes no reason for giving the agreement a construction which would alter its plain terms in material respects.

It is contended also that nearly all of the owners of the Stuart lands, commencing with Dr. Stuart, have recognized plaintiff's right to receive water from the lower well; that their conduct in this respect is entitled to consideration in the construction of the agreement, and that it tends to show that the successors of appellants understood the agreement as granting plaintiff rights in the lower well.

Plaintiff was permitted to testify, over objection, that before he purchased the land, Dr. Stuart told him that he thought he could produce more water with a larger pump, and that he would put a "booster" on the lower well and lift water to the land which plaintiff was buying. This testimony was received, we presume, upon the theory that the contract was ambiguous in failing to describe with certainty the system of water pipes from which plaintiff should receive water, and that extrinsic evidence was admissible to dispel the uncertainty. It is also contended that the claimed oral agreement of Dr. Stuart might be proved as a part of the contract because it related to a collateral matter and one which the written agreement did not purport to cover, but this position is obviously untenable. The evidence was not addressed to a feature of the agreement which was collateral to those set forth in the writing, nor to a matter inadvertently omitted therefrom. It went to the very heart of the subject-matter of the agreement. The testimony, in our opinion, should have been excluded. There was no uncertainty in the language which described the water system from which plaintiff was to receive water as, "the system of pipes as now constructed and maintained", unless the word "maintained" should be construed as including the manner of use of the

system at that time. There can be no doubt that plaintiff was to receive water from the four-inch line which took water from above his land. There was no pump in that system designed to carry water to higher land and no connection between the four-inch line and the lower well. No attempt was made to show that the lower well had ever been used as a part of the upper system. When water was later carried to the upper lands from the lower well it was with a heavier pump and a reconstructed pipe line. The testimony did not explain anything and the only purpose it could have served was to attempt to vary the terms of the written instrument by adding to the obligations of Dr. Stuart in a most material respect. Furthermore, the subject-matter of the contract was an interest in real property, which could be transferred only by written instrument. Yet the oral promise, antedating the written agreement, has been accorded full effect by the findings and judgment, as fully as if it had been carried into the writing.

The case does not fall at all within the reasoning of the authorities which allow the introduction of extrinsic evidence to identify the subject-matter of a contract or deed. Rather it falls within that class of cases which holds that evidence of oral negotiations preceding the execution of a written contract may not be received to contradict, add to, or vary the terms of the writing. Under the guise of aiding in the interpretation of the contract, the oral agreement has been given such effect that the contract has been altered, so that instead of the right being limited to the system as then "constructed and maintained", it is made to apply to that system, plus heavier pumping equipment, a pipe connection between the well and the four-inch line, a reenforcement or rebuilding of that line to carry the pressure of the water lift, and a booster to lift the water. Thus a gravity system has been converted into a force system. And all of this has been done upon the theory that it is permissible as an interpretation of the expressed intention of the parties. Parol evidence is admitted where uncertainty exists as to the meaning of a contract to show what the parties meant by what they said, but it is not admitted to show that they meant something other than what they said. (*United Iron Works* v. *Outer H. etc. Co.,* 168 Cal. 81 [141 Pac. 914].) The conclusion of the trial court as to the meaning of the contract, erroneously reached through a con-

sideration of this incompetent evidence, is not binding upon this court.

Plaintiff testified that Dr. Stuart in 1911 paid for an irrigation of plaintiff's land from the Fordyce well, which belonged to an adjoining owner, and also that subsequent owners of the Stuart land occasionally paid for water which plaintiff obtained from adjoining owners between the years 1911 and 1919. He contends also that defendants George P. Raymond and Mary Perkins Raymond recognized his right to water from the lower well, and these alleged admissions are urged in support of plaintiff's construction of the agreement. We think this evidence was entitled to slight consideration. Those who owned the property prior to 1919 never furnished plaintiff with any water from the lower well, nor did he demand it of them, nor did he install or offer to install a pump, or to pay for the pumping, which he would have been required to do under the contract had he been permitted to use water from the lower well. His right to receive water from the upper source in an amount sufficient for his needs was superior to the rights of the owners of the Stuart lands to use the same water, since the contract was binding upon all of them. They all used water from the upper source, and they evidently used it when plaintiff himself was in need of it and there was not enough for both. When, therefore, the several owners assisted plaintiff in getting irrigation water elsewhere, their conduct in so doing, if it be conceded that such conduct was proved, only tended to show that they felt themselves under obligation to provide plaintiff with more water than he was receiving. This would be quite natural if they were using any of the water from the upper source during any of the times when it was needed on plaintiff's land. It appears that the right of Rilovich to receive water from the lower well was not at any time admitted by any of those who owned the Stuart lands prior to 1919 when George P. Raymond acquired them.

In the summer of 1921, George P. Raymond, having abandoned the upper well, was in need of water for trees on what was known as the Horn property, which adjoined the Rilovich land on the east. To accomplish this he put in a larger pump and "booster"'' at the lower well which would raise the water to the Horn property. He also rebuilt the four-inch line up to the northeast corner of the Horn property and, by the

use of a tractor belted to the pump, raised water through the pipe line to the northeast corner of the Horn property, which was some 30 feet higher than the well. The excess or "spill" water from the irrigation flowed across the Horn property into a sump adjoining the Rilovich property. With the consent of Raymond this excess water was used by plaintiff in the summer of 1921. A portion of the water pumped up through the four-inch line went above the lateral leading to the Horn land, and found its way into the Rilovich two-inch line, and the latter had the use of it for irrigation. During the spring of the year 1921 and of 1922, surface water came from the canyon through the four-inch pipe line and was available for the use of Rilovich, and it appears that he used the water during those periods. During the summer of 1922, Rilovich received the excess water from the irrigation of the Horn tract and also some water which was pumped up by George P. Raymond through the four-inch line. The evidence was that no charge was made to Rilovich for the water thus furnished. None of the appellants Raymond ever conceded that plaintiff was entitled to water from the lower well. When they furnished him with such water it was with the express declaration that they did so as a matter of accommodation and not because of his right. Had they conceded him the right he now claims, there would have been no lawsuit. Nor is it reasonable to consider the occasional acts of the parties as late as 10 or 12 years after the contract was executed as having a bearing upon the intentions and understandings of Rilovich and Dr. Stuart at the time the contract was made.

We have now to consider questions relating to damages. As the contract was construed by the Supreme Court on the former appeal, the amount of water which plaintiff bought was to be measured by his needs for irrigation. The obligations of the several defendants and of the former owners of the sources of supply would have been satisfied when plaintiff had received all of the available supply from the upper source at times when he needed it. If appellants failed or refused to furnish water from that source, which was available at times when Rilovich needed it, they failed to meet their obligations under the contract and became liable to plaintiff for the consequent damages. Therefore, the amounts recoverable by plaintiff should have been limited to such damages as

were sustained by plaintiff by reason of the failure of appellants to furnish, from the upper source, all of the water which plaintiff needed for irrigation up to the full capacity of that source. Neither neglect nor abandonment of the upper well or sources of surface water by appellants could be excused as long as it was reasonably possible to produce water therefrom in amounts sufficient to be of substantial benefit to plaintiff.

Damages were allowed by the trial court as against each defendant upon the theory that there was an abundance of water at all times, to which plaintiff was entitled. It is manifestly impossible to sustain the judgment for damages either in whole or in part under the construction which we give the contract. The evidence is not such as to allow this court to direct findings which would be sufficient. There is no way by which we can determine how much water was available or when it was available from the upper source during the years when those sources were used, nor how much was withheld from plaintiff when he needed it. No attempt was made to prove the capacity of the upper water sources subsequent to 1921. The upper well, as we have stated, was abandoned in 1921. Defendant Charles G. Raymond made a test of the well at that time and did not succeed in pumping any substantial amount of water. It is his contention that the well failed completely in that year and that he was unable to supply any water from it thereafter. There is no evidence that the well could have produced water in commercial quantities in the summer of 1921 or at any later time. The significance of this fact in the determination of damages is obvious, in view of the fact that plaintiff's right to water was limited to the upper supply.

The court found that in the years 1919, 1920 and 1921, plaintiff was damaged to the extent of $6,000 on account of the loss of seed bed and nursery stock, for which amount judgment was given against defendant George P. Raymond; that in 1924 plaintiff had 30,000 seed bed and 25,000 nursery stock; that 54,000 of these trees would have been grown successfully and would have been sold between 1924 and 1930 at an average price of $1.59 per tree; that in 1924 plaintiff's trees would have produced four orchard boxes per tree and each year thereafter one more orchard box per tree until 1930, when each tree would have been producing ten orchard boxes. The net value of these orange crops, which were never grown, was allowed as damages. Against Mary Perkins Raymond,

who owned the property from 1922 to 1926, judgment was given for $30,176, for loss of orange crops and nursery stock. Judgment was given against Charles G. Raymond, who acquired the property in 1926, in the sum of $17,000 for loss of crops and nursery stock. Plaintiff was awarded $12,000 against Mary Perkins Raymond and Charles G. Raymond, jointly and severally, for what would have been the cost of replanting the orange orchard and bringing the trees to the age they had as of the time they were found to have become valueless, which was some time between 1922 and 1929, together with the value of crops which might have been raised during the time required to restore the orchard.

Appellants have much to say about the speculative character of the proof of damages, and there is merit in their contentions. There was none but the most theoretical and speculative evidence of the productivity of orange trees on the Rilovich property, especially that relating to the estimated yearly increase in bearing capacity. There was a great discrepancy in the producing capacity of adjoining groves, and there was evidence that the orange land in the vicinity was spotted and far from uniform, so far as soil conditions were concerned. However, it is not necessary to discuss the sufficiency of the facts in evidence to support the findings of the court as to the future value of the nursery stocks or theoretical crops that might have been raised if the water supply had been adequate. The whole case, as we have stated, was decided upon the basis that there was ample water at all times to irrigate the Rilovich land. It is tacitly conceded by the parties that the water supply from the upper source was inadequate for that purpose, except possibly when plaintiff's needs were small. The extent of the deficiency was not shown by the proof, nor did the court attempt to make a finding with reference thereto. Were the same theories attempted to be used upon a retrial of the case, it would be necessary for the court to receive evidence as to the theoretical growth of nursery stock and the growth of crops of oranges over a long period of years and the extent and value of the nursery stock and crops from year to year, all in view of the fact that it is doubtful in the extreme that there would have been a sufficient amount of water for irrigation even though plaintiff had received all water available from the upper well. The theories of damages applied by the court

as to the several claims of damages were not proper. under the facts of the case and as they will have to be developed upon another trial.

We recognize the rule that wrongdoers are not allowed to escape responsibility in damages for their acts merely because the circumstances are such as to render it extremely difficult or impossible to ascertain the amount of damage with certainty. The law does not require absolute certainty, but gives effect to the reasonable probabilities of the case as established by the best evidence which is available. (*Hacker Pipe & Supply Co.* v. *Chapman Valve Mfg. Co.,* 17 Cal. App. (2d) 265 [61 Pac. (2d) 944].) Purely speculative profits are never allowed. (*Crow* v. *San Joaquin etc. Irr. Co.,* 130 Cal. 309 [62 Pac. 562, 1058].) It is needless to say that as between two rules for the measurement of damages, either of which is adequate to show the extent of the damage, that one will be preferred which affords the better and more satisfactory means of reaching an accurate and certain result.

Under the construction which we have placed upon the contract by which plaintiff's water right was created, plaintiff's damage, if he suffered recoverable damage, may be established adequately and with reasonable certainty and under definite and well-established principles of law. There is no need for speculation or conjecture.

It may not be questioned that plaintiff is entitled to damages equal to the value of his nursery stock lost in whole or in part through the failure of defendants to furnish water as agreed.

The proper measure of damages for the loss of plaintiff's orange trees, exclusive of the nursery stock, is well settled in this state. Plaintiff's trees were a part of his land. Damage to the trees was damage to the land. The measure of the damage was the amount of depreciation in the value of the land caused by the loss of or damage to the trees. (*Shearer* v. *Park Nursery Co.,* 103 Cal. 415 [37 Pac. 412, 42 Am. St. Rep. 125] ; *Kolberg* v. *Sherwin-Williams Co.,* 93 Cal. App. 609 [269 Pac. 975] ; *Chipman* v. *Hibberd,* 6 Cal. 162; *Montgomery* v. *Locke,* 72 Cal. 75 [13 Pac. 401] ; *Hill* v. *Morrison,* 88 Cal. App. 405 [263 Pac. 573] ; *LeBrun* v. *Richards,* 210 Cal. 308 [291 Pac. 825, 72 A. L. R. 336] ; *Perkins* v. *Blauth,* 163 Cal. 782 [127 Pac. 50] ; *Crum* v. *Mt. Shasta Power Corp.,* 117 Cal. App. 586 [4 Pac. (2d) 564] ; Sutherland

on Damages, 4th ed., sec. 1019.) Where damages are proved and allowed on the above basis, there is no warrant for allowing further damage for the loss of crops which the trees might have borne in the future if they had not been destroyed. An allowance of damages upon the above basis on account of trees wholly or partially destroyed would necessarily include all of the proper elements of damage under that branch of the issue of damages. The value which bearing orange trees add to land is based upon the value of crops which they might bear. When the loss of the tree is compensated in damages to the full value, the value takes the place of the tree and there will be no future crops to consider.

Respondent successfully contended before the trial court that the proper measure of damages to the trees themselves was the cost of restoration of the trees, plus the value of crops that would have been grown, during the time that was lost, had the trees not been destroyed, and damages were allowed against Mary Perkins Raymond and Charles G. Raymond, jointly, for the sum of $12,000 upon that basis. In support of the application of this rule respondent cites *Lowe* v. *Yolo County etc. Water Co.*, 157 Cal. 503 [108 Pac. 297], and *Miller & Lux Inc.* v. *Pinnelli*, 84 Cal. App. 42 [257 Pac. 573]. These were cases which involved injury to and partial destruction of crops of alfalfa or pasturage resulting from deprivation of water or from damage done by straying cattle. It was recognized in these cases that in addition to an allowance for the value of crops destroyed, damages might be awarded for the cost of reseeding the plants, the roots of which had been destroyed, and that the value of the crops that would have been grown during the period of reseeding and growth was allowable as the equivalent of the rental value of the land during that period. Appellants do not question that the true measure of damages in case of partial destruction of alfalfa or meadow grass was applied in the cases cited. They contend that the rules have no application to the destruction in whole or in part of orchard trees such as those belonging to plaintiff. In this contention they are undoubtedly correct. The rule of damages in such case is as we have stated it, namely, the depreciation in the value of the land, and this is exclusive of every other kind of damage to the trees themselves. Respondent suggests that both rules are applicable, and that he may rely upon either. We see a vast

difference, however, between the restoration of a part of an established crop of alfalfa, which can be accomplished readily and with a fair measure of certainty, and the restoration of such an orange grove as the one involved in the present case. We have heretofore sufficiently pointed out the difficulties in the application of the restoration rule to show that it cannot be applied to the facts in evidence.

This action has been pending for more than ten years and inasmuch as a retrial is necessary, we deem it advisable to indicate the issues to which, in our opinion, the proof should be directed upon a retrial.

The court should determine the values which the nursery stock and seed stock would have had from time to time if defendants had furnished plaintiff with all available water from the upper source as he needed it; the excess, if any, of such values, over the values the nursery stock had with the water that was actually furnished, should be taken as plaintiff's damage to the nursery stock. The entire damage to nursery stock should be fixed as of dates not later than the time when defendants ceased to furnish water altogether. No allowance should be made on the basis of lost profits after that time. If plaintiff lost growing orange crops in whole or in part because of the failure of any of the defendants to furnish water which was available from the upper source when plaintiff needed it, he may recover the value of the crops lost. This proof should not extend beyond the time when defendants ceased to furnish water, nor beyond the date with relation to which damage to the land is fixed.

Plaintiff is entitled to damages in the amount of the excess, if any, of the value of his land with the orange trees growing thereon in the condition they would have been in if, at all times, plaintiff had been furnished, as needed, with all of the water which was available from the upper source, above the value of the land with the trees in their actual condition. If the proof fails to show with reasonable certainty that the upper water supply would have produced sufficient water to prevent further deterioration in the trees after June, 1921, the damage to the land on account of loss or deterioration of the trees should be fixed as of that date. Plaintiff is also entitled to damages in the amount of the reasonable cost (exclusive of capital cost) of irrigating water which he obtained elsewhere after defendants ceased to furnish water al-

together, provided, however, that the amount of damage on this account should be limited to the cost of acquiring that quantity of water which he would have received during the same period if the defendants had complied with their contract to furnish water. Plaintiff is entitled to recover the excess of the rental value of his land with the water that was available from the upper source, above the rental value of the land with such water as plaintiff used thereon, during that period when defendants failed to furnish any water. Damages on account of loss of rental value should not be based on the value of crops of oranges or nursery stock which might have been grown and sold during that period.

In the trial of these issues as to damages, the time when defendants ceased to furnish plaintiff with water should be taken as the time when they ceased to furnish water from the upper source. The capacity of the upper source (and by that is meant both the well and the surface water supply) is to be determined upon the hypothesis that defendants had used all reasonable means to take the greatest available amount of water therefrom for plaintiff's use.

The water that plaintiff had a right to use was not limited to the quantity which would have flowed through his two-inch pipe line. He had a right to take all of the water from the defendants' four-inch line when he needed it. He had a right to use a pipe line of as large diameter as that of the defendants. If he did not choose to increase the capacity of his line, defendants cannot be held to responsibility for his failure to receive the additional water which he might have obtained with a line of greater capacity; if, however, he demanded and was refused the right, and was not allowed to increase the capacity, the defendant or defendants refusing the right would be responsible for the resulting damage.

The decree should recognize plaintiff's perpetual right and easement to water from the water system described in the contract, or as the same has been or may be remodeled to take water from the upper sources as they existed in 1910, or as they have been or may be restored or reconditioned, together with the right to install and establish a pipe line therefrom across the land of defendant Charles G. Raymond of sufficient size to enable him to obtain, as required, the water that may be available from the upper sources and to take water therefrom in accordance with the views expressed in this opinion,

not exceeding the amount required for the irrigation of plaintiff's land, the same to be at the expense of plaintiff, as provided in the agreement.

The judgment is reversed for further proceedings in accordance with the views herein expressed.

York, Acting P. J., and Doran, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 28, 1937.