[L. A. No. 16317. In Bank.—April 27, 1940.]

MARY LOUISE FISHBAUGH, Respondent, v. ERNEST C. FISHBAUGH, Appellant.

Meserve, Mumper, Hughes & Robertson and Baldwin Robertson for Appellant.

Mathes & Sheppard, Wm. C. Mathes, Gordon F. Hampton and Lloyd Melvin Smith for Respondent.

EDMONDS, J.—The controversy which occasioned this litigation concerns the actions of the appellant in securing a modification of the terms of a property settlement made before a divorce between him and the respondent, his former wife. She sued to set aside two later agreements, assertedly executed by her because of certain fraudulent misrepresentations made by the appellant. A judgment was rendered in her favor which, in effect, declares that the respective rights and obligations of the parties are as fixed by these agreements, and awards her damages in the sum of $50,000.

The litigants were married in 1914 and have since resided in California, where the appellant became a well-established and prosperous physician and surgeon. They lived together until March, 1930, when Dr. Fishbaugh left the family home. At this time all of their assets were community property.

The original property settlement was executed on December 23, 1930. Early in 1931 plaintiff sued for divorce. An interlocutory decree approving the property settlement agreement was entered on July 7, 1931, followed by a final decree the next year.

By her complaint the respondent alleges that in 1933, Dr. Fishbaugh represented to her that he desired to start anew, and wished to remarry her as soon as he was financially able, but that unless the requirements of their original agreement were modified he would be forced to resort to bankruptcy. In reliance upon these false representations, she agreed to rescind the previous agreement which she had made with him and entered into a preliminary one dated July 5, 1933, and another dated July 12, 1933. The second cause of action seeks to set aside these agreements for the reason that there was no consideration for them. As a third ground for relief, Mrs. Fishbaugh asserts that an actual controversy exists between her and the doctor with respect to their legal rights and duties under the various writings she signed which

entitles her to a judicial determination of their effect. The prayer of the complaint is for declaratory relief, including a cancellation of the agreements executed in July, 1933, and the reinstatement of the 1930 agreement, or a partial rescission together with an award of damages, or if no rescission can be had, an award of both actual and exemplary damages.

The appellant answered this complaint by denying all of its material allegations and pleading, as special defenses, that his former wife had not rescinded the contract of 1933 nor restored $10,000 paid by him as consideration therefor. He also charged that respondent is guilty of laches in allowing an unreasonable length of time to elapse before attempting to rescind, because, although she knew after 1932 that he had no intention of remarrying her, yet she continued accepting the benefits of the July, 1933, agreements until January, 1936.

Upon these issues the court found that prior to the execution of the two agreements in July, 1933, Dr. Fishbaugh made numerous demonstrations to his former wife that he loved her and hoped that they could reestablish the family home; also, that he promised to remarry her as soon as he was able to straighten out his financial obligations. That the respondent, in reliance upon these representations, and upon assertions that unless the agreement made by him in 1930 was modified he would be forced into bankruptcy, agreed to terminate a trust made for her benefit, release certain insurance policies and real estate, rescind the agreement of December, 1930, and enter into a modified contract dated July 12, 1933.

The court further found that Dr. Fishbaugh at no time intended to remarry his former wife, but that she did not discover this until she and her daughter were ousted from possession of their home in 1935. That at no time in 1933 was the appellant's financial condition such that he was faced with bankruptcy; that he concealed the fact from her that he then had approximately $3,000 in cash on hand, and that his false statements and representations were made with the intention of causing her to execute agreements of July, 1933. That respondent, throughout their married life, and for some time subsequent to July, 1933, had held the deepest affection for Dr. Fishbaugh and relied upon him to handle her business affairs; that he knowingly accepted this trust and confidence, but used it to obtain an unfair advantage over her.

Other findings of the court are that Mrs. Fishbaugh would not have executed the later agreements if she had not relied upon and believed the representations made to her; that it is impossible to restore the *status quo* existing before July, 1933; that the original agreement of the parties was worth $180,000 to her in 1933, but the value of the July, 1933, agreements at that time was only $130,000; and that she has, therefore, been damaged in the sum of $50,000. Accordingly, Mrs. Fishbaugh was given judgment for that amount, and the rights and duties of the parties were declared to be those fixed by the two later agreements executed in July, 1933.

At the conclusion of the taking of evidence, Honorable Goodwin J. Knight, the trial judge, announced that he intended to find for Mrs. Fishbaugh, whereupon the appellant filed a statement of disqualification against him asserting bias and prejudice on his part. A motion to strike this statement from the files was granted by Judge Kenny. After the findings and judgment were signed, the appellant moved for a new trial, again urging the disqualification of Judge Knight. The motion constituting the second attempt to disqualify him was heard by Judge Schmidt and denied. Later the motion for a new trial was denied by Judge Knight, whereupon Dr. Fishbaugh appealed from the judgment and also from the order made by Judge Schmidt.

As grounds for reversal of the judgment, the appellant contends that there is no substantial evidence to support the findings upon which it is based. More specifically, he asserts that the evidence does not support the finding either that Mrs. Fishbaugh has been damaged in the sum of $50,000 or in any other amount, or that any false statements concerning his financial condition were made by him, or that he promised to remarry the respondent, or that there was any reliance by her upon any promise of remarriage or statement of financial distress. That if there was, in fact, such misrepresentations, the court erroneously found that Mrs. Fishbaugh did not know until July, 1935, that he had no intention of remarrying her and allowed her to rescind after a delay of two and one-half years. He vigorously attacks the finding that a fiduciary relationship existed between them in 1933.

The appellant further urges that the trial judge decided the issues of fact upon his knowledge of circumstances outside the record and not proper subjects of judicial notice. An-

other contention is that certain errors were made in the construction of the July 12, 1933, contract which imposes duties upon him contrary to its express terms. Finally, he declares that Judge Kenny erred in striking the statement of disqualification made against Judge Knight. He insists that the charges of bias and prejudice were sufficient to require a verified answer within the time allowed by section 170 of the *Code of Civil Procedure,* and because this provision was not complied with, all proceedings thereafter, which include the signing of the findings of fact, conclusions of law, and the judgment, are void.

Although there is sharp conflict in the evidence concerning Dr. Fishbaugh's alleged representations that he intended to marry the respondent as soon as he was able to straighten out his financial troubles, her testimony to that effect is not only positive and direct but is supported by many letters written by him. She declared that in the early part of 1933, the doctor negotiated with her and her attorney for a modification of the agreement he had previously made. At that time, she said, he represented that he was having serious financial difficulties and had been advised that bankruptcy was his only solution. He intimated, also, that a discharge in bankruptcy would probably relieve him of his obligations under the property settlement agreement.

Apparently these efforts were unavailing until July, 1933. According to Mrs. Fishbaugh, upon a visit to her at that time he told her he was in great financial distress and needed her assistance. He made protestations of love to her and told her he was desirous of reestablishing the family home. That night or the next night, Dr. Fishbaugh had dinner with her in her home. On this occasion, also, he said that he loved her and was sorry for everything that he had done, and that he would remarry her as soon as he was financially able to do so.

On July 3d, Mrs. Fishbaugh and her attorney met with the doctor and at that time the attorney was instructed to give appellant "anything he wants". Thereafter, on July 5th, an instrument was executed which authorized a partial termination of the trust provided for in the original agreement, and released to appellant $120,000 in life insurance. On July 12th another contract was executed.

The doctor and Mrs. Fishbaugh agree that during the month of July he was not only a frequent visitor at her home, but that they also went out to dinner several times, to the theater, and to the homes of mutual friends. He denies that he at any time told the respondent that he loved her, or that he wished to reestablish marital relations, but the trier of fact has resolved the conflict in evidence against him and that finding is conclusive upon appeal. It is, therefore, immaterial whether representations concerning bankruptcy were fraudulently made.

There is also substantial evidence to support the finding that the respondent relied upon Dr. Fishbaugh's representations. For several months prior to July, 1933, he had been attempting to secure a modification of the property settlement agreement made at the time of divorce. It was not until after his visits to Mrs. Fishbaugh that she consented to release him from his former obligations and instructed her attorney to give him "anything he wants". It is certainly not unlikely that manifestations of love for his former wife and assertions of a desire to remarry her, of which she testified in detail, were decisive factors in securing her consent to the modified agreement, and the trial judge was entitled to credit that testimony and find in accordance with it.

The appellant's contention that the evidence does not support the award of damages requires a consideration of the three contracts which are in controversy. The agreement of 1930 provided that all of the real property then owned by the parties should be conveyed to a trustee, the net income to accumulate until it amounted to $200,000. Dr. Fishbaugh was required to pay $1,000 per month to the trustee until the funds in its hands totaled $200,000. Policies of insurance upon Dr. Fishbaugh's life to the amount of $120,000 were assigned to the trustee as additional security. Pending the accumulation of the trust funds, Dr. Fishbaugh agreed to pay the respondent $1,000 per month, these payments to continue during her lifetime until the trustee held $200,000 upon which there was an income sufficient to pay her at least $1,000 per month. Mrs. Fishbaugh was also given the exclusive right to occupy the family home until the same should be sold by the trustee, and the doctor agreed to pay the taxes, assessments, and repairs thereon. She was also to receive $15,000 in cash, payable over a period of three years, and certain items of personal property were set aside to her. Dr. Fish-

baugh retained numerous shares of stock, his office furniture, books, automobile, and professional accounts receivable.

The first agreement executed by the parties in July, 1933, revoked the trust provisions requiring the deposit of insurance policies and authorized their reassignment to Dr. Fishbaugh. The second agreement terminated the trust and provided that all property then held by the trustee should be conveyed to the doctor as his own separate property. Its terms required him to pay his former wife $750 per month, so long as she remained unmarried, and until she received the sum of $50,000. After that amount had been paid she was to receive $500 per month for the remainder of her lifetime or until marriage. In the event the doctor's income from the practice of his profession should exceed $50,000 in any one calendar year, he agreed to pay her $3,000 additional for that year at the rate of $250 per month. He also agreed to pay her $10,000 within ten days after the execution of the contract, and $40,000 more as soon as reasonably possible.

Upon the sale of any of the real property conveyed by the trustee to Dr. Fishbaugh pursuant to the agreement, one-half of the proceeds of the sale after the payment of expenses and encumbrances was to be paid to the respondent and credited by her upon the obligation to pay $50,000. To secure this payment the contract provided for the assignment of the life insurance policies to her. It also included Dr. Fishbaugh's agreement that if he should die before her, she should receive the balance of the $50,000 then unpaid in lieu of monthly payments.

Mrs. Fishbaugh was also given the right to reside in the home until the appellant shall ''desire to live there and give her 30 days' notice to quit the premises'' and the assignment to her of certain personal property, consisting principally of household furniture, was affirmed. In the event of default in the performance of any of the terms of the contract, Mrs. Fishbaugh might demand restoration of the former agreement. Concurrently, Dr. Fishbaugh agreed to pay any income taxes that should be assessed against her.

■ The trial court having found that the respondent executed the two contracts of 1933 because of the fraudulent representations made to her by Dr. Fishbaugh, she was entitled to judgment for damages in an amount equal to the difference in value, if any, to her between the original con-

tract and the later agreements. (*Garstang* v. *Skinner,* 165 Cal. 721 [134 Pac. 329]; *Cross* v. *Bouck,* 175 Cal. 253 [165 Pac. 702].) ▉ This amount is, undoubtedly, difficult to determine with certainty because many provisions of each contract depend upon contingencies. But one who commits a wrongful act cannot wholly escape liability because of such a difficulty. (*Hartman Ranch Co.* v. *Associated Oil Co.,* 10 Cal. (2d) 232 [73 Pac. (2d) 1163]; *Rilovich* v. *Raymond,* 20 Cal. App. (2d) 630 [67 Pac. (2d) 1062].)

Under the contract made in 1930, Mrs. Fishbaugh expressly retained all of her rights to the community property placed in trust for her benefit. However, when the trustee held $200,000 in cash, it was authorized to reconvey to Dr. Fishbaugh, as his separate property, all real estate then remaining in the trust, and to reassign the life insurance policies "free of any claim of the trustee and of the second party". But until that event occurred the respondent's interest in the trust was of substantial value, for the evidence shows that the real estate cost about $325,000 and at the time of the trial was subject to encumbrances aggregating approximately $55,000. She also had a further interest in the *corpus* of the trust, for after the $200,000 was accumulated, if she outlived her daughter, one-half of that amount was subject to her testamentary disposition or passed to her heirs.

In the later contract, Dr. Fishbaugh agreed to pay the respondent $50,000 as consideration for the termination of the trust and the trustee's conveyance to him of all property then held by it. This amount was not payable at once but, except for $10,000, only "as soon hereafter as he reasonably can do so". However, the appellant agreed to pay on account of this obligation one-half of the net amount which he should receive upon the sale of any real property conveyed to him by the trustee.

In addition to these amounts, the respondent might receive additional sums from the sale of the former community property, in that the remaining one-half of the purchase price, after all defendant's outlays had been deducted, was payable to her. But these outlays were specified as including the original purchase price, interest at 6 per cent, insurance, taxes, assessments and all other charges directly or indirectly paid by the appellant for upkeep and maintenance. The value of this interest was, therefore, problematical and, very possibly, comparatively small.

To appraise with certainty the value of Mrs. Fishbaugh's interest in the former community property under each of the two contracts is difficult, if not practically impossible. Certainly the doctor obtained property of very considerable value for his promise to pay her $50,000. The difference in value to her, so far as monthly income is concerned, between the two is more readily ascertainable. The least amount she was entitled to receive, according to the terms of the original contract, was $1,041 a month for life. Under the second contract, Dr. Fishbaugh agreed to pay her $750 per month during her lifetime, or so long as she remained unmarried, with the added provision that after the $50,000 consideration for the revocation of the trust had been paid by him, then the amount of the monthly payments should be reduced to $500. This was subject to the further contingency that if the appellant's net income from his profession should exceed $50,000 for any calendar year, then he would pay her an additional amount of $3,000 for that year.

Under these circumstances, $750 per month over a term of years is probably the highest average amount Mrs. Fishbaugh would receive. In July, 1933, she had a life expectancy of 24.29 years, as computed by the "American Experience Table for Mortality", and the difference to her in the value of an annuity for life of $1,000 per month and one of $750 per month was $47,373.30. She testified that the former contract was worth $125,000 more to her than the 1933 agreement. The evidence, therefore, amply supports the findings of damages.

The appellant also attacks other findings in which the court construed provisions of the 1933 contract concerning the time when he was required to make payments upon the obligation of $50,000. One of these is that Dr. Fishbaugh agreed to pay this amount "within a reasonable time after the 12th of July, 1933". This finding, asserts appellant, is not supported by the evidence.

According to the construction of the contract by the trial court, the appellant agreed to pay Mrs. Fishbaugh, in all events, the sum of $50,000, $10,000 not more than ten days after the 12th day of July, 1933, and the balance within a reasonable time thereafter. Also, the court found, he agreed to pay to her, prior to the maturity of the whole unpaid balance thereof, additional sums on account of the obligation from time to time as and when he could make such periodical

payments with reasonable safety to his financial condition. As against this construction, the appellant insists that his obligation to her is not to pay when he is able, but when, in his judgment, he is able to do so.

However, the express terms of the contract are, first, that "in all events" appellant will pay $50,000 "as soon hereafter as he reasonably can do so"; second, that he will pay $10,000 within ten days after the execution of the contract; and, third, "that from time to time hereafter, when and in his judgment he can do so with reasonable safety to his then financial condition, he will pay to second party additional sums until she has thus been paid . . . the full sum". The first of these promises is an unconditional promise to pay "in all events", as soon as he could "reasonably" do so, a reasonable time being dependent upon the circumstances. Of course, the appellant's financial ability is the principal circumstance to be considered in determining what is a reasonable time for performance. The second and third promises are to make payments on account.

The appellant thereby promised, in effect, that he would not withhold all payment until a reasonable time for payment of the full sum had elapsed, but would pay $10,000 within ten days and would make further payments on account "from time to time" prior to the maturity of the full amount, whenever he could do so "with reasonable safety to his then financial condition". If, as he contends, the provision as to his "judgment" modifies the entire obligation, and does not refer merely to payments on account, why were the significant phrases "in all events" and "as soon hereafter as he reasonably can do so", used in connection with the promise to pay the amount of $50,000? Manifestly the appellant's promise was not the ordinary promise to pay "when able", such as that considered in *Van Buskirk* v. *Kuhns,* 164 Cal. 472 [129 Pac. 587, Ann. Cas. 1914B, 932, 44 L. R. A. (N. S.) 710] (1913), and similar cases, but, as found by the trial court, to pay $50,000 "in all events", and with the further obligation to make partial payments thereon as his financial condition allowed him to do so.

The appellant also complains of the trial court's further finding that the balance of the $40,000, after payment of the $10,000, is owing and unpaid by the appellant; that at the time of the commencement of this action, a reasonable

time had not yet elapsed for the payment of this amount, but that since July, 1933, the defendant could reasonably have paid to Mrs. Fishbaugh the sum of $10,000 with reasonable safety to his financial condition; and that by reason of the appellant's failure to make any payment whatever during this period on account of his obligation, he is now in default in the performance of his obligations under the contract. But the appellant's own testimony showed that during the period of thirty months from July, 1933, until the commencement of this action, the net cash income from all sources amounted to more than $125,000. This and other evidence furnishes substantial support for the finding of the trial court.

■ However, the court also found that Dr. Fishbaugh agreed with the respondent to sell, within a reasonable time after July 12, 1933, the real property ·conveyed to him by the trustee. This finding is completely at variance with the express provision of the contract, which is that "if, when and as he sells" any of it, that he will pay one-half of the net proceeds of each sale upon his obligation. There is no agreement upon the appellant's part to sell any of this property, hence the court was in error in making its finding in this regard. An agreement to apply the proceeds from any sale of the property to an obligation which the promisor has agreed to pay "in all events" lays no requirement upon him to sell such property within a reasonable time, or at all.

■ Concerning the efforts made by the appellant to disqualify Judge Knight, the statement of asserted bias or prejudice does not comply with the requirements fixed by section 170 of the Code of Civil Procedure. According to this statement, the judge said at the conclusion of the trial that appellant "misrepresented his financial condition" to his former wife and that he "took the law into his own hands". But Judge Knight was acting as the finder of the facts, and if the evidence introduced before him was in conflict, he had the right and it was his duty to believe the testimony of the party who it appeared to him was telling the truth.

Other statements made by Judge Knight concern the value of a piece of property upon which there was no evidence introduced except the original sale price, and an opinion as to whether a prominent banker might have given Dr. Fishbaugh assistance in his financial difficulties. Complaint is also made that Judge Knight read depositions not introduced into evi-

dence. But neither the statements charged to Judge Knight nor his reading of the depositions, if he did so, show bias or prejudice on his part. If a judge in finding facts falls into error by basing his conclusions upon inadmissible evidence, such an action may constitute sufficient ground for a reversal of the judgment upon appeal, but will not support a charge of disqualification under section 170 of the Code of Civil Procedure. (*McEwen* v. *Occidental Life Ins. Co.*, 172 Cal. 6 [155 Pac. 86].) The statement of disqualification was therefore properly stricken from the file. For the same reasons the order of December 3, 1936, denying the appellant's motion to disqualify Judge Knight, must be affirmed and it is so ordered.

However, the judgment is modified by striking therefrom the provision: "That by said agreements of July, 1933, the defendant became and is now obligated to the plaintiff to sell the properties hereinafter described within a reasonable time after the 12th day of July, 1933; that at the time of the commencement of this action a reasonable time had not yet elapsed for the performance by the defendant of said obligation to sell said real properties." As so modified it is affirmed, respondent to recover costs on appeal.

Shenk, J., Gibson, J., Curtis, J., Carter, J., and Waste, C. J., concurred.

HOUSER, J., Dissenting.—I dissent.

Undeniably, the facts are that for and during a period of several weeks next preceding the execution of the two contracts which form the basis of the instant action, the various provisions of such contracts not only were the subject of negotiations and were thoroughly considered by each of the parties thereto, but also that the said provisions constituted the subject matter of each of several serious discussions that occurred between able and experienced counsel who represented the respective parties. Everyone who in any way was connected with the matter was completely familiar with each and every detail of the original contract, as well as with each of the several provisions of the new contracts which thereafter were executed. No one was deceived nor was anyone misled by any representation which may have been made by defendant. The single circumstance that he may not have expressly divulged the fact that he had approximately $3,000

on deposit in a bank in no way operated to plaintiff's disadvantage, nor did it constitute a factor in her determination to enter into either of the agreements. That item of defendant's assets, considered in comparison with the total value of the properties and the other respective interests of the parties, was so small as to be regarded as insignificant and of no consequence as an inducement to the execution of the contracts. As a matter of record, in addition to the several advantages by which plaintiff benefited by reason of the provisions of the new contract, she received a cash consideration of $10,000. In such a situation, from a legal standpoint it was impossible that plaintiff could have been defrauded. In fact, the only ground (if any) upon which plaintiff's case may be rested is the asserted fact based on her testimony to the effect that she was induced to enter into each of the contracts by reason of the alleged fraudulent promise of defendant that he would remarry her. Although perhaps unnecessary of corroboration, no substantial evidence may be found in the record to support her testimony in that regard. To the contrary, following the date when, according to her testimony, defendant had promised to remarry her, the undisputed evidence discloses the fact that each and every letter, communication, or documentary evidence of any kind refutes the testimony that was given by plaintiff in that respect. Not only were the parties treating one with the other "at arm's length" but, practically, they were "at swords' points". At no time during the course of the negotiations when the respective attorneys were present was an asserted promise by defendant of remarriage to plaintiff even mentioned or hinted. Every scrap of evidence and every inference deducible from any source not only proclaim the unreliability of plaintiff's testimony in that regard, but also demand (without practicability of successful denial) that such testimony be regarded as unequivocally impeached. To my mind, far from being considered as substantial evidence of a promise by defendant to remarry her, plaintiff's testimony fails to provide even a "scintilla" of evidence in that regard. But conceding the possibility that such conviction may not be well founded, assuredly it is patent that plaintiff slept on such rights as at any time she may have possessed. As far as the record herein discloses, for two and one-half years plaintiff carefully guarded and safely kept her secret. To no one did she ever divulge the asserted fact of such a

promise save possibly to her present attorneys who assumedly were informed thereof shortly preceding the commencement of the instant action. If her claim was genuine why was it not asserted at some time during the period when negotiations were pending, or at least within a reasonable time after it must have been apparent to plaintiff that defendant had no intention of ever marrying her? The authorities are numerous to the effect that although a plea of the statute of limitations may not be available to a defendant; nevertheless if an unreasonable delay in bringing an appropriate action has ensued the defendant may successfully set up such a plea as a defense. In my opinion, by her laches plaintiff has estopped herself from the maintenance of the instant action.

The foregoing suggestions constitute my principal objections to the conclusion that has been reached in the prevailing opinion herein; but the fact that other objections have not been here set forth should not be considered as conclusive or even as an indication that there are not several other equally valid and sufficient reasons why the judgment should be reversed.

Rehearing denied.