[Civ. No. 28492. First Dist., Div. Two. Aug. 19, 1971.]

MOST REVEREND ARCHBISHOP JOHNATHAN et al.,
Plaintiffs and Respondents, v.
CON S. SHEA, as Administrator, etc., Defendant and Appellant;
THE STATE OF CALIFORNIA, Intervener and Appellant.

**COUNSEL**

Jerome J. Cahill and Victor S. Barlogio for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, and John E. Barsell, Jr., Deputy Attorney General, for Intervener and Appellant.

Bacigalupi, Elkus, Salinger & Rosenberg and William G. Fleckles for Plaintiffs and Respondents.

## OPINION

**SHOEMAKER, P. J.**—Dionysius Diachenko, a retired archbishop of the Russian Orthodox Church, died intestate leaving funds in excess of $50,000 on deposit in two savings accounts. There being no heirs, the probate of the estate was taken over by the public administrator, Shea.

Plaintiffs Johnathan and Dositheus, two representatives of the Russian Orthodox Church, brought suit against defendant Shea, claiming that the decedent's estate belonged to the church. The State of California intervened in the action, opposing plaintiffs' claim and asserting that the decedent's estate should escheat to the state.

The prime question presented to us is whether or not, under the canon law of the Russian Orthodox Church, the funds belong to the church or to the State of California.

The cause was submitted to the trial court upon stipulation and judgment was rendered in favor of plaintiffs. The defendant public administrator and the intervener State of California appeal.

The decedent, Dionysius Diachenko, was born in Russia in 1882 and was educated in that country. In 1914 he was ordained a priest in the Russian Orthodox Church, and in 1917 he fled from Russia during the Russian Revolution. He thereafter resided for some time in Manchuria and later in China. In 1935, while residing in China, he took the vows of monasticism of the Russian Orthodox Church. In 1941 the decedent immigrated to the United States, and in 1947 he was consecrated a bishop of the Russian Orthodox Church. In 1957 the decedent was elevated to the rank of archbishop. He held this position until his death in 1967, but retired from active duties in 1959.

From the date of his retirement until the date of his death, the decedent received $100 per month as a pension from the church. Commencing in 1955, he also received a social security pension in the amount of $103 per month.

In addition to the above factual history, the parties also stipulated that the Russian Orthodox Church was one of the major Christian churches of the world and that the Pedalion was a book which embodied the Holy Tradition of said church. It was further stipulated that the Pedalion had

been translated into English in a work entitled The Rudder; that for purposes of ascertaining the canon law of the Russian Orthodox Church, The Rudder was accepted by the parties as an official English translation of the text and substance of the Holy Tradition of the church; that the proper interpretation to be placed upon the canons, as revealed in The Rudder, was to be established in the instant action. The parties agreed that the deposition of plaintiff Johnathan, an expert in the field of canon law, might be received in evidence.

Appellants assert that the canons of the Russian Orthodox Church themselves demonstrate that a bishop is not required to hold his property in trust for the church during his lifetime nor to will it to the church upon his death, but that, to the contrary, the canons expressly provide that a bishop may own property and may dispose of same and will same to beneficiaries other than the church. Since this contention is dispositive of this appeal, appellants' other arguments need not be discussed.

Respondents' entire case was based upon the theory that when the decedent became a monk and subsequently a bishop, he took religious vows which obligated him to abide by the canon law. Under respondents' interpretation of the canons, the decedent was required to hold his property in trust for the church during his lifetime and will it to the church upon his death. However, a reading of the applicable provisions of the canon law demonstrates that respondents' position is without merit.

Respondents rely heavily upon Canon 6 of the First and Second Council of Constantinople, which provides in pertinent part as follows:[1] "Monks ought not to have anything of their own. Everything of theirs ought to be assigned to the monastery. For blissful Luke says concerning those who believe in Christ and conform to the monks' way of life: 'Neither said any of them that aught of the things which he possessed was his own; but, on the contrary, they held everything in common' (Acts 4:32). Wherefore unto those wishing to lead the monastic life permission is given to dispose of their property to whatever persons they may wish, so long, that is to say, as the property may be legally transferred to them. For after their entering upon the monastic life the monastery has the ownership of all they bring with them, and they have nothing of their own to worry about other than what they have been allowed to dispose of beforehand. If anyone be caught appropriating or claiming any possession that has not been made over and conveyed to the monastery, and revealed to be enslaved to the passion of love of property, that possession shall be seized by the abbot or bishop,

---

[1]All quotations of the canons discussed herein are taken from Cummings, The Rudder (1957), which was stipulated to be the official English translation of the text and substance of the Holy Tradition of the church.

and shall be sold in the presence of many persons, and the proceeds therefrom shall be distributed to the poor and indigent. . . ." (P. 461.)

Respondents also rely upon Canon 89 of the Regional Council of Carthage, which provides that if a bishop names as his heirs any persons who are heretics or Grecians, in preference to the church, he shall be anathematized and his name shall no longer be mentioned among the Priests of God, (Pp. 656-657.)

Appellants, on the other hand, rely upon Canon 40 of the 85 Canons of The Holy Apostles, Canon 24 of the Regional Council of Antioch, and Canon 40 of the Regional Council of Carthage.

Canon 40 of the 85 Canons of The Holy Apostles provides: "Let the Bishop's own property (if, indeed, he has any) be publicly known, and let the Lord's be publicly known. In order that the Bishop may have authority to dispose of his own property when he dies, and leave it to whomsoever he wishes and as he wishes. And lest by reason of any pretext of ecclesiastical property that of the Bishop be submerged, be it that he has a wife and children, or relatives, or house servants. For it is only just with God and men that neither the church should suffer any loss owing to ignorance of the Bishop's property, nor the Bishop, or his relatives, should have their property confiscated on the pretext that it belonged to the church. Or even to have trouble with those who are quarreling over his property, and to have his death involved in aspersions." (Pp. 60-61.)

Canon 24 of the Regional Council of Antioch provides: "The rules and regulations of the Church must be rightly kept for the Church with all diligence and in all good conscience and faith reposed in God, who is the superintendent and judge of all things, and the affairs of the church should be governed with the judgment and authority of the Bishop entrusted with all the laity and the souls of all the members of the congregation thereof. What belongs to the dominion of the Church is manifest and well known to the Presbyters and Deacons under his jurisdiction, so that these persons ought to be well aware, and not ignorant, of whatever is property of the church, so that nothing should escape their observation to enable them, in case the Bishop should exchange life, in view of the fact that the things belonging to the dominion of the church are manifest, to prevent any of them from being embezzled or made away with and lost, and to see that none of the Bishop's own things are disturbed on the pretense that they are ecclesiastical property. For it is just and pleasing to both God and man that the Bishop should leave his own property to whomsoever he may will it, but that things belonging to the church should be kept for it; and that neither should the church sustain any loss or damage, nor should property of the Bishop be confiscated on the pretense that it belongs to the church;

nor should those persons be involved in any trouble in claims thereto, with the result of defaming him after death." (P. 548.)

Canon 40 of the Regional Council of Carthage provides: "It has pleased the Council to decree with regard to Bishops, Presbyters, Deacons, or any Clerics whatever, who owned nothing to begin with, that if in the course of their service in an episcopate or during their office, they buy any fields or any territories whatever in their own name, they are to be considered as though guilty of having made an inroad upon the Lord's business or the Lord's things, unless they should therefore when reminded of this agree to donate these things to the Church. If, on the other hand, the liberality of anyone or succession by descent should bring them anything personally, even of that they shall bestow upon the Church whatever portion they are willing to give her. But if even after offering it to her, they should backslide, or go back on their word, being unworthy of ecclesiastical honor, let them be judged to be reprobates." (P. 628.)

The canons set forth above are clear, explicit and devoid of ambiguity, and they provide that a bishop in the Russian Orthodox Church is authorized to possess property of his own during his lifetime and to will same to beneficiaries other than the church upon his death. Although respondents rely strongly upon Canon 6 of the First and Second Council of Constantinople, that canon merely provides that an individual who becomes a monk must dispose of all his property before entering the monastery and must abstain from acquiring any property of his own as long as he continues in the monastic life.

When a monk is elevated to the rank of bishop, the canons expressly allow for the possibility that he may acquire property of his own, and the primary duty imposed upon him is to keep his own property separate and apart from that belonging to the church. Assuming that he fulfills this duty, there is no prohibition whatever against his willing his own property to beneficiaries other than the church, and, to the contrary, he is expressly authorized to do so.

Canon 40 of the Regional Council of Carthage makes it clear that a bishop may acquire property of his own. That canon states that a bishop, having previously been a monk and therefore having "owned nothing to begin with," should not purchase fields or territories in his own name with funds belonging to the church. However, the canon goes on to provide that if a bishop should acquire anything "personally," through the liberality of another or by descent, the bishop is obligated only to bestow upon the church whatever portion he is willing to give. (P. 628.)

Canon 40 of the 85 Canons of The Holy Apostles likewise distinguishes between a bishop's "own property" and that belonging to the church. The bishop is required to make it publicly known which property belongs to him and which belongs to the church "[i]n order that the Bishop may have authority to *dispose of his own property when he dies, and leave it to whomsoever he wishes and as he wishes.*" (P. 60; italics added.) We can conceive of no clearer way of stating that a bishop has full testamentary power over his own property.

Canon 24 of the Regional Council of Antioch also distinguishes between property belonging to the church and a bishop's "own things," and the members of the clergy are instructed to keep themselves well aware of the extent of the church's property so that none of the bishop's property is disturbed on the pretext that it belongs to the church. The canon further provides that "it is just and pleasing to both God and man that the Bishop *should leave his own property to whomsoever he may will it. . . .*" (P. 548; italics added.)

Of all the canons relied upon by the parties, the only one which purports to limit a bishop's testamentary control over his property is Canon 89 of the Regional Council of Carthage, which provides that a bishop shall be anathematized if he wills his property to heretics or Grecians. It is implicit in this very limitation that a bishop is free to will his property to any persons who are not heretics or Grecians.

■ Respondents contend that the proper interpretation to be accorded the canons is a question which must be resolved by expert testimony. They point out that the deposition of plaintiff Johnathan was received in evidence in the instant case and furnished the only expert opinion as to the correct interpretation of the canons. Respondent Johnathan testified that the canons obligated a bishop to leave all his property to the church upon his death and that if he failed to do so, he was under the certainty of damnation. Respondents take the position that since no other expert testimony was offered in evidence, this court is bound by respondent Johnathan's interpretation of the canon law.

■ The flaw in this argument is that expert testimony, even if uncontradicted, is circumstantial rather than direct evidence, and it is not binding upon the court. (*People* v. *Gentry* (1968) 257 Cal.App.2d 607, 611 [65 Cal.Rptr. 235].) ■ Further, parol evidence is admissible only where there is uncertainty as to the meaning of a writing, but it is not admissible to show that the writing means something other than what it says. (*Rilovich* v. *Raymond* (1937) 20 Cal.App.2d 630, 639 [67 P.2d 1062].) ■ Where there is no uncertainty or ambiguity to be found in a written document, the court may not properly consider

extrinsic evidence in reaching its conclusion as to its proper construction. (*Brant* v. *California Dairies, Inc.* (1935) 4 Cal.2d 128, 133 [48 P.2d 13]; *Yarus* v. *Yarus* (1960) 178 Cal.App.2d 190, 201 [3 Cal.Rptr. 50].)

■ In the instant case, the applicable provisions of the canon law are devoid of any ambiguity, and this court is clearly not bound by expert testimony to the effect that the canons mean something other than what they explicitly state.

■ Respondents have at no time claimed that the funds in the decedent's savings accounts constituted church property as opposed to property which the decedent acquired as an individual.

Respondents based their claim against the decedent's estate solely upon the existence of a contract or implied trust whereby the decedent was obligated to hold his own property in trust for the church during his lifetime and to will it to the church upon his death. Respondents relied solely upon the canons of the church as establishing this contract or implied trust, but the canons are plainly susceptible of no such construction.

The judgment is reversed, with directions to the trial court to enter judgment that plaintiffs-respondents take nothing by their complaint.

Taylor, J., and Kane, J., concurred.

A petition for a rehearing was denied September 17, 1971.